IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| SHIRLEY I. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:09-cv-01042-NKL |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Pending before the Court is Plaintiff Shirley I. Smith's ("Smith") Social Security Complaint [Doc. # 1]. Smith seeks judicial review of the Social Security Commissioner's ("Commissioner") denial of her request for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381, *et seq.,* for the period November 8, 2002 through January 18, 2008. After the Appeals Council of the Social Security Administration ("Appeals Council") remanded the case following the Administrative Law Judge's ("ALJ") initial denial of Smith's claim, the ALJ subsequently found that Smith was "disabled" from January 18, 2008, but was not entitled to benefits prior to that date. Such determination became the final decision of the Commissioner when the Appeals Council denied Smith's request for review. Smith has exhausted her administrative remedies, and jurisdiction is conferred on this Court pursuant to 42 U.S.C. § 405(g). For the following reasons the Court reverses

and remands for the ALJ to reconsider Smith's RFC after taking into account limitations caused by Smith's chronic migraine headaches.

I.  **Background**

   A.  **Factual and Procedural History**[1]

Smith, who has a high school education, has been employed by a trucking company to wash and clean trucks, shuttle vehicles being repaired, perform oil changes, and occasionally answer the telephone, deliver payroll, and file. [Tr. 150]. Smith filed an application for disability insurance and supplemental security income benefits on October 13, 2004, claiming she became disabled on November 8, 2002, due to "Migraines, knee and back injury, dizziness, stomach pains, fibromyalgia, HBP[,] DEPRESSION." [Tr. 389, 393]. On April 14, 2009, following an evidentiary hearing [Tr. 409-421], the ALJ issued a written decision finding that Smith was not disabled prior to January 18, 2008, but became disabled on that date and continued to be disabled through the date of the decision. [Tr. 22]. After the Appeals Council denied Smith's request for additional administrative review of the ALJ's decision, Smith sought review by the Court.

Smith, age 57, is about 5' 8" tall whose weight has fluctuated between 285.4 pounds [Tr. 239] and 260 pounds [Tr. 227] since 2002. Smith indicates that she began having migraines around thirty years ago, but that since 1994, they have increased in severity and frequency. [Tr. 225]. Despite her headaches, Smith testified that she

---

[1] The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary. Portions of the parties' briefs are adopted without quotation designated.

2

attempted to continue to work while taking Imitrex to treat her headaches and relieve nausea. However, Imitrex induced sleepiness, which caused her to miss work. [Tr. 413]. She last worked in 2002. Smith testified that she at one time took up to eighteen pills each month for her headaches, but her physician cut her back to only one pill per week due to liver damage. She also testified that Dr. Roger Cady, who had treated her migraines for over twenty years, attempted to put her on preventative medication, such as Topamax. However, Dr. Cady discontinued the medication after it caused her to slur her words.

Smith stated that since her first hearing almost two years prior in March 2007, she continued to experience frequent migraines that required her to lie down in a dark room with cold packs on her head. She stated that dizziness made her unable to get up, and that she was having migraines twelve to fifteen days a month. Smith testified that she did not have insurance, but that her son or sister helped her pay for her visits with Dr. Cady.

Smith also testified that she is depressed due to the limitations that her migraines have imposed on her in her daily activities. [Tr. 416 ("I think the migraines make me depressed because I can't, because I can't function, I don't have a life.")]. She described memory problems and said she experienced panic when leaving her house because of her dizzy spells. Smith also testified that she did not even take showers unless someone was present to assist her. She stated that she never received mental health treatment because she had no money and no insurance, but that Dr. Cady had tried to treat her depression with medication. Unfortunately, Smith suffered from side effects of the medication.

3

### a. Smith's Medical History for Treatment of Migraine Headaches

Smith was primarily treated for her migraines by Roger K. Cady, M.D., whose office is located in Springfield, Missouri. With respect to the relevant time period at issue, Dr. Cady examined Smith on October 30, 2002, October 29, 2003, November 26, 2003, April 6, 2004, June 2, 2004, September 8, 2004, January 25, 2005, March 29, 2005, July 19, 2005, October 18, 2005, June 27, 2006, February 20, 2007, May 29, 2007, August 28, 2007.

In October 2002, Smith reported having more frequent headaches, approximately three to four days per week. She took topiramate for thirty-eight days, but continued to have daily headaches and numbness and language difficulties, and discontinued usage. She also took Imitrex three days per week. [Tr. 215].

In October 2003, Smith continued to have four to five headaches per week, but took Imitrex at the onset of a headache, and "doesn't repeat often." [Tr. 213]. Dr. Cady noted that Smith appeared to "respond[] well" to Imitrex. [Tr. 213].

In November 2003, Smith saw Dr. Cady because she had been having migraines almost daily for the preceding three weeks. She informed Dr. Cady that she thought that her headaches increased in frequency because she had weaned herself off of Topamax (topiramate) due to paresthesia. Smith also shared that she was under quite a bit of stress at that time. [Tr. 211]. Dr. Cady provided Smith with Imitrex samples and requested that she follow up within one week. [Tr. 212]. According to Smith's medical records, she did

not follow-up as instructed, but did call Dr. Cady over two weeks later on December 12, 2003, complaining of flu-like symptoms. [Tr. 210].

In April 2004, Smith indicated that her headaches were slightly better but that she was unable to take Topamax due to paresthesia. [Tr. 209]. Smith also stated that she felt her headaches went through cycles through the year. She stated that her headaches were once per week, which was down from four to five days per week. [Tr. 209].

In June 2004, Smith weighed 275 pounds, a loss of more than nine pounds since her previous visit, weighing 275 pounds, and indicated that the Atkins diet had helped with her headaches. She shared that she had "not one [headache] the entire 1st month being on Atkins." [Tr. 207]. It was noted that her headaches improved and that her headache frequency had gone up only when she went on vacation and her diet was disrupted. [Tr. 207].

In September 2004, Dr. Cady noted that Smith was having one to two migraines per week and that "Imitrex 50 mg does abort the migraine, but then it tends to come back again for the next 2 and sometimes 3 days, requiring treatment every day." [Tr. 203]. He also noted that "[Smith] has not been able to maintain her diet as well as she would have liked, but has started back on the Atkins' diet. She does note that it helped her in the past." [Tr. 203]. At this visit, Dr. Cady gave Smith 100 mg of Imitrex, asked her to remain in the office, and observed that it "helped her headache." [Tr. 204]. He then increased her prescription of Imitrex to 100 mg. [Tr. 204].

On December 18, 2004, Smith saw Jeri Kenagy, D.O., for a consultative examination. Smith reported that she could lift up to thirty pounds, stand fifteen minutes at a time and two hours total in an eight-hour day, and walk four hours on level ground. [Tr. 227]. She indicated that sitting was "not a problem though she shifts her weight." [Tr. 227]. Dr. Kenagy noted that Smith had pain with squatting more than halfway but had a negative straight leg raise and "very good range of motion in the shoulder, elbow, wrist, and cervical neck." [Tr. 228]. Dr. Kenagy also indicated that Smith "had no trouble getting on and off the exam table, and up and out of a chair." [Tr. 227]. She diagnosed Smith with fibromyalgia, a history of depression, knee and low back pain, dizziness with tinnitus, and "[a]bdominal pain with nausea and vomiting." [Tr. 228]. Dr. Kenagy noted that it was "difficult to estimate the degree of limitation" Smith experienced due to migraines but indicated that Smith's reported frequency of migraines "likely [would] severely limit her ability to sustain even a part-time job." [Tr. 228].

In January 2005, Smith returned to Dr. Cady stating that she was having more frequent headaches on a near daily basis. She stated that she fell and injured her back about two weeks prior to the visit, which seemed to escalate her headaches. [Tr. 248]. Dr. Cady noted that "Imitrex does give her quite a bit of relief, but is not always abortive, and the headache returns 12-14 hours later." [Tr. 248]. Smith reported no side effects to the medication except some palpitations at night. Dr. Cady started Smith on Atenolol. [Tr. 248].

In March 2005, Smith stated that her headaches were again more frequent. She indicated that when she had been taking Z-Pak (azithromycin), the frequency of her headaches decreased. But, since coming off of the medication, Smith asserted that it seemed to have changed her headache frequency. [Tr. 254]. Dr. Cady increased her Atenolol prescription to 50 mg twice daily.

In July 2005, Smith informed Dr. Cady that she continued to have three to four migraines per week. She stated that Imitrex worked very well, but Atenolol did not seem to help. Dr. Cady weaned Smith off Atenolol and then started her with topiramate. [Tr. 244].

In October 2005, Smith visited Dr. Cady for a follow-up due to her headaches that she reported occurring in a cycle where she had headaches "almost daily for up to 1-2 weeks," followed by a period of no headaches for another week or ten days, only to have the headaches recur again. [Tr. 243]. Smith reported that she discontinued taking topiramate because she developed eye pain, but could not get an opthalmologic evaluation because of the cost. Dr. Cady thought that Smith needed to be on prevention and thus prescribed Smith with Depakote with gradually increasing dosage over time. [Tr. 243].

In June 2006, Smith returned to Dr. Cady's office for a reevaluation. She stated that she has about four to five headaches per week, and took Imitrex about three to four days a week. Dr. Cady noted that "Imitrex does work well" and that Smith had a "good therapeutic response to her Imitrex." [Tr. 240]. Smith stated that after taking Imitrex,

however, the headache would return in one day. Dr. Cady noted that Smith "continues to have trouble using any kind of preventive": Smith stopped taking Depakote after several weeks possibly due to gastrointestinal pain; topiramate was tried twice and in both instances "failed"; Elavil caused Smith to gain weight. [Tr. 240].

In February 2007, Smith came in for a reevaluation of her migraines. She noted that they were more frequent. Dr. Cady's notes indicated that Smith was using Imitrex, which gave her "good relief." [Tr. 238].

In May 2007, Smith returned for a reevaluation. She stated that she has had more migraines this month, and that her migraines occurred approximately between fifteen and eighteen times per month. She noted that "Imitrex works very well and does stop her migraines," and that the headache would occasionally return. [Tr. 375]. Dr. Cady increased Smith's dosage of Metoprolol to 25 mg in the morning and 50 mg at bedtime.

In August 2007, Smith noted a marked increase in the frequency of her migraines and that she had about fifteen to twenty migraines per month for the last two months. [Tr. 374]. Smith's current prescription of Imitrex provided nine tablets per month, but Smith indicated that nine tablets were insufficient to treat the frequency of headaches she experienced. Further, she stated that while the Imitrex markedly attenuated the headache, they did not completely abort the pain. [Tr. 374]. Smith stated that she "can not really afford preventive medications," but Dr. Cady noted that she was taking her Metoprolol without any difficulty. [Tr. 374].

      **b.**      **Smith's Medical History for Treatment or Observations of Depression**

Dr. Cady noted on October 30, 2002, that Smith "[e]xperiences depression. Never tried the Celexa as prescribed. Has lost 9 days of work this month." [Tr. 215]. Dr. Cady prescribed Wellbutrin at this visit. [Tr. 215]. A year later, on November 26, 2003, Dr. Cady noted that Smith was "tearful" during the examination. [Tr. 211]. About five months later on April 6, 2004, Dr. Cady observed: "Knows she's depressed but doesn't like to take meds." [Tr. 209].

In December 2004, C. William Breckenridge, Psy.D., performed a consultative examination of Smith. [Tr. 217]. Smith indicated that she did "her own cleaning and laundry," "most of her own shopping," crocheted, rarely cooked, and occasionally sang at church and went out to eat with her son. [Tr. 219]. Smith appeared moderately depressed, evidenced low self-esteem, and "reported suicidal ideation, but denied intent." [Tr. 219]. At that time, Smith was taking Wellbutrin, but did not think it helped. She cried easily and often during the interview. Dr. Breckenridge noted Smith had good eye contact, "presented with a full, appropriate and mood congruent affect," and "answered questions in a coherent and logical manner." [Tr. 219]. He indicated that Smith "appeared to be at least moderately depressed." [Tr. 219]. Dr. Breckenridge noted that Smith's "logical memory [was] well below average" and that she had "difficulty with digits backward," but he also noted that Smith "was able to sustain concentration during three mental control exercises." [Tr. 219]. Dr. Breckenridge diagnosed Smith with depressive disorder not otherwise specified, and reported that Smith's Global Assessment of Functioning ("GAF") score was currently 50, and 55 in the past year. [Tr. 220]. He

9

opined that Smith "would appear to have difficulty remembering simple instructions (probably due to her depression)" but "appear[ed] to be capable of sustaining concentration and persistence while working on simple tasks." [Tr. 221]. Dr. Breckenridge also opined that Smith's "ability to interact socially and adapt to [the] environment appear[ed] to be moderately to seriously affected by her depression." [Tr. 221].

Over one week later, Jeri Kenagy, D.O., performed a consultative examination. [Tr. 225]. Dr. Kenagy informed Smith that taking an antidepressant intermittently, as Smith reported she did, would not relieve symptoms of depression. [Tr. 229].

On July 22, 2006, Smith arrived in the emergency room complaining of numbness in her left arm and shakiness. [Tr. 275]. Staff noted Smith had a normal gait and normal mental status. [Tr. 275]. They diagnosed Smith with "[l]eft arm discomfort with abnormal electrocardiogram." [Tr. 276]. On January 8, 2007, Smith arrived in the emergency room complaining she felt "[s]haky, weak, and lightheaded." [Tr. 259]. Staff diagnosed Smith with resolved palpitations and tremors. [Tr. 259].

On February 20, 2007, Dr. Cady indicated in his notes that his impression of Smith's January 2007 trip to the emergency room was that staff concluded that Smith may have suffered an anxiety reaction. [Tr. 238]. He opined Smith had "an underlying anxiety disorder" but that the disorder did not "represent[] any significant impairment for her ability to follow rules, relate to coworkers, deal with the public, interact with supervisors or function independently." [Tr. 236]. Dr. Cady also opined that Smith's

10

headaches responded to medication but that Smith "still [had] very frequent migraines" and that she had a "significant disability related to migraine." [Tr. 236]. He noted that Smith was "prone to have [migraine] attacks during periods of stress," that many attacks were "unpredictable," and that "this undoubtedly impair[ed] her ability to function as a reliable employee." [Tr. 236].

On December 15, 2008, Cynthia Hill, Ph.D., performed a consultative examination. [Tr. 319]. Dr. Hill noted Smith had "no psychiatric hospitalizations or outpatient mental health treatment." [Tr. 319]. She indicated that Smith had poor remote memory and concentration but good judgment and fair thought process and recent and immediate memory. [Tr. 320]. Dr. Hill diagnosed Smith with moderate major depressive disorder without psychosis, specific phobias of hospitals and motor vehicle accidents, and panic disorder without agoraphobia. [Tr. 321]. She assessed Smith with a GAF score of 35, and opined that Smith could not "sustain concentration and persistence in even simple tasks" and could understand but not "remember instructions as required for a regular work-setting." [Tr. 321]. Dr. Hill indicated that Smith was "limited in her ability to interact socially due to her depression and her hypersensitivity to other's feelings" and that her "panic and her tendency to give up impair[ed] her ability to adapt to her environment." [Tr. 321]. She opined that Smith had poor abilities in several areas, such as maintaining attention and concentration. [Tr. 322-23]. Dr. Hill also reported in a check-box format that Smith had poor ability to deal with work stresses; function

independently; maintain, understand, remember, and carry out detailed job instructions; and demonstrate reliability. [Tr. 322-24].

## B. The ALJ's Decision

To establish her entitlement to benefits, Smith must have shown that she was unable to engage in any substantial gainful activity by reason of a medically determinable impairment or combination of impairments which could be expected to end in death or to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d) (2006). For the purposes of the Act, Smith was not under a "disability" unless her impairment was so severe that she was unable to do her previous work or–any other kind of substantial gainful work which existed in the national economy. *Id.* The ALJ found that Smith did not meet this burden at any time from November 8, 2002, her onset date, to January 18, 2008, the date from which the ALJ found her to have been disabled.

The ALJ found that Smith had several severe impairments: fibromyalgia, depression and anxiety, mild degenerative joint disease of the lumbar spine, and obesity. [Tr. 17]. *See* 20 C.F.R. 404.1520(c) and 416.920(c). The ALJ further found that Smith

> retained the residual functional capacity ("RFC") to perform light work including lifting ten pounds frequently and twenty pounds occasionally, sitting six hours per workday, standing and walking six hours per workday, and occasionally stooping, crouching, crawling, kneeling, bending, and climbing. Due to mental and emotional impairments, she is limited to simple, routine, repetitive work with no production quotas, low stress, no public contact, and only occasional contact with coworkers.

[Tr. 18]. Although the ALJ found that Smith could not perform past relevant work because they all involved at least medium exertion, he did find that Smith could perform

unskilled, light exertion work such as folding machine operator, photocopy operator, and bench assembler. "Thousands" of such jobs exist in the local and national economies. [Tr. 18, 306-07].

Smith raises several arguments on appeal. She asserts that the ALJ's decision is not supported by substantial evidence because the ALJ: 1) failed to properly accord proper weight to the opinion of Dr. Cady, a treating physician, thereby erring in finding that migraines were not a severe impairment and failed to properly assess limitations caused by Smith's migraines in determining her residual functional capacity ("RFC"), 2) failed to properly evaluate the severity of Smith's mental impairment and associated functional limitations prior to January 18, 2008, 3) failed to properly assess limitations caused by obesity prior to January 18, 2008, 4) improperly discredited Smith's testimony, and 5) improperly relied on the vocational expert's testimony. [Doc. # 7, at 16-20].

## II. Discussion

In reviewing the Commissioner's denial of benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). "An ALJ's decision is not outside the 'zone of

choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

> A. **Weight afforded to Dr. Cady's Opinion and Consideration of Limitations Caused by Migraines in Determining Smith's Residual Functional Capacity ("RFC")**

Smith has the burden of proving that her impairment or combination of impairments is severe. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). It is not particularly difficult to meet this standard, but the standard is not "toothless." *Id.* at 708. Taking this standard into account and considering the record as a whole, the Court concludes that there is not substantial evidence to support the ALJ's finding that Smith's migraine headaches were not severe.

Smith was seen by Dr. Cady, her treating physician, at least fourteen times between October 2002 and October 2007. She consistently reported migraine headaches ranging from one per week to one per day. She was prescribed and regularly took Imitrex to treat her migraines but did not tolerate or could not afford preventative treatment. It was noted in her chart that Smith reported that Imitrex "works very well and does stop her migraines," [Tr. 375 (May 2007 visit)], but also that her headaches would sometimes return in various frequencies after taking Imitrex. [S*ee, e.g.*, Tr. 248 (January 2005: headache returns 12-14 hours later); Tr. 240 (June 2006: headache returns in one day); Tr. 375 (May 2007: headache would occasionally return); Tr. 374 (August 2007: Imitrex did not completely abort the pain)].

Dr. Cady personally observed that administration of 100 mg of Imitrex "helped her headache." [Tr. 204]. [*See also* Tr. 213 (October 2003: "responds well" to Imitrex"); Tr. 248 (January 2005: "Imitrex does give her quite a bit of relief"); Tr. 240 (June 2006: "good therapeutic response to her Imitrex"); Tr. 238 (February 2007: Imitrex gave Smith "good relief"); Tr. 374 (August 2007: Imitrex "markedly attenuate[s] the headache"]. However, in November 2003 Dr. Cady indicates "intractable migraine." [Tr. 211]. As Dr. Cady is a headache specialist, his opinion is entitled to great weight. *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).

While Imitrex stopped the migraines once they started, Smith had to lay down with an ice pack for a period of time even after taking the Imitrex. There is no suggestion in the record that this is an abnormal response to a migraine headache. Having to lay down for periods while the Imitrex works and the headache subsides, will have more than a minimal affect on a person's ability to work. While Smith tried preventative drugs, she testified, and Dr. Cady's notes substantiate, that there were side affects. She also indicated that she couldn't always afford the preventative drugs. Therefore, the fact that the Imitrex was effective once she got a migraine headache, does not mean that her ability to work was not impaired while she had the headache and before the Imitrex and rest eliminated it.

While it is true that Smith did not see Dr. Cady for nearly an entire year from October 2002 to October 2003, and for a period of about eight months from October 2005 to June 2006 and June 2006 to February 2007, she did see him fourteen times over a five

year period, consistently for migraine headaches and reported a significant history of migraines at each visit. She also reported the times when the migraines did not occur. This record as a whole doesn't support a finding that the only times Smith had migraines was in close proximity to the date of her appointments with Dr. Cady. Moreover, she testified that both travel limitations and finances made it difficult for her to see Dr. Cady and yet she did get to him at least fourteen times for the same ailment. Furthermore, she had a prescription for Imitrex which she regularly used and even with appointments with Dr. Cady she was unable to control the chronic pattern of migraines.

Given the minimal standard for finding severity, the Court cannot say that there is substantial evidence to support the ALJ's non-severe finding. Nor is it persuaded that the ALJ's erroneous finding is harmless merely because the ALJ considered her migraine related mental limitations when crafting Smith's RFC. For that RFC, the ALJ did not consider any work interruption that would be caused by her migraine. He did not address it with any specificity. Therefore, on this record the Court cannot say that the ALJ's error was harmless.

### B. Evaluation of the Severity of Smith's Mental Impairment and Associated Functional Limitations Prior to January 18, 2008

Smith argues that the ALJ "substituted his own opinion for that of Dr. Breckenridge," who had performed a mental status exam of Smith. The ALJ's decision to discount Dr. Breckenridge's opinions is supported by substantial evidence. *See Choate v. Barnhart*, 457 F.3d 865 (8th Cir. 2006). First, Dr. Breckenridge examined Smith only once. 20 C.F.R. §§ 404.1527(d), 416.927(d) (frequency of contact with a source is a

relevant factor in assessing the source's opinion); *Kelley*, 133 F.3d at 589 (citing *Metz v. Shalala*, 49 F.3d 906, 908 (8th Cir. 1996)) ("The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."). Next, the record as a whole does not support all of the limitations indicated in Dr. Breckenridge's report. *Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007) ("The ALJ may reject the conclusions of any medical expert . . . if they are inconsistent with the record as a whole."). An ALJ can discount a treating physician's opinion based in part on plaintiff's own testimony about his activities. *See Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009). Here, Smith reported that she cleans, does laundry, does most of her own shopping, crochets, and occasionally sings at church or goes out to eat with her son.

Additionally, the ALJ stated that he had considered Dr. Hill's report, which noted Smith's "depressed mood, labile affect, and poor concentration." [Tr. 19]. However, he did not find that Dr. Hill's report supported Dr. Breckenridge's conclusion. He noted that Dr. Hill's report is dated December 2008, long after Dr. Breckenridge's 2004 report. The ALJ specifically commented that the record was bare of any evidence as to Smith's mental status between the time of Dr. Breckenridge's report and January 18, 2008, the date of Dr. Hill's report. Without some evidence of what happened between the two reports, the Court cannot find that the ALJ erred by rejecting the argument that Dr. Hill's finding in 2008 is relevant to the status of Smith when she was examined by Dr. Breckenridge four years earlier.

Smith argues that it is "reasonable to assume that Smith's condition . . . gradually worsened over time." [Doc. # 7, at 24]. Even so, Smith's long-time physician opined in February 2007 that Smith was "able to understand and carry out complex tasks and remember details," [Tr. 221, 236, 321] contrary to both Dr. Breckenridge's and Dr. Hill's opinion that Smith would have difficulty remembering simple instructions and was able to understand but not remember instructions required in a regular work setting. Dr. Cady did find that when Smith has a migraine or is in the premonitory phase of a migraine, her ability to perform these tasks and make personal and social adjustments would be markedly impaired. [Tr. 237], but that related to the affect of migraines and not to her depression.

### C. Consideration of Limitations Caused by Obesity in Determining Smith's RFC and Smith's Credibility

Smith argues that the ALJ failed to explain how Smith's obesity impacts her ability to perform work-related activities, contrary to instructions by the Appeals Council. Specifically, Smith argues that the ALJ did not consider the combined effects of obesity with her other impairments–fibromyalgia, mild degenerative joint disease of the lumbar spine, and depression and anxiety–in assessing her RFC.

"It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations." *Pearsall*, 274 F.3d at 1217-18 (8th Cir. 2001) (citation omitted). Here, the ALJ specifically discussed the observations of Dr. Jeri Kenagy in his decision: "claimant walked without assistive device, had no trouble getting

on and off the examination table, had normal strength and sensation, and good range of motion in all joints and extremities including the cervical and lumbar spine." [Tr. 19]. Smith also testified that her depression was not due to her obesity, but rather due to her migraines and lifestyle. [Tr. 416]. Smith's medical records are also devoid of any medical opinion that Smith's obesity is linked to her migraines. Rather, the only connection between weight and Smith's migraines in the record are Smith's own comments to Dr. Cady in June 2004 that the Atkins diet had helped with her headaches. [Tr. 207]. Thus, in examining the records as a whole, the ALJ properly determined that Smith's obesity did not impact her work capacity beyond what he indicated in his RFC assessment.

## III. Conclusion

Accordingly, it is hereby ORDERED that this case is reversed and remanded to the ALJ for the purpose of reconsidering Smith's RFC after taking into account limitations cause by Smith's migraines. The ALJ will also have to reconsider those limitations in conjunction with other limitations he finds credible and present those limitations in a new hypothetical to the vocational expert.

                                            s/ NANETTE K. LAUGHREY
                                            NANETTE K. LAUGHREY
                                            United States District Judge

Dated: January 27, 2011
Kansas City, Missouri